UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ASSOCIATED COMMERCIAL FINANCE, INC., | Civil No. 04-5111 (PJS/JJG) |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |
| BRADY MARTZ & ASSOCIATES, P.C., | |
| Defendant. | |

Paul L. Ratelle, FABYANSKE WESTRA HART & THOMSON, PA, 800 LaSalle Avenue, Suite 1900, Minneapolis, MN 55402, for plaintiff.

Thomas J. Shroyer, MOSS & BARNETT, PA, 90 South Seventh Street, Suite 4800, Minneapolis, MN 55402, for defendant.

Plaintiff Associated Commercial Finance, Inc. ("ACF") loaned money to Christian Brothers, Inc. ("CBI"). Brady Martz & Associates, P.C. ("BMA") acted as CBI's accountants and audited CBI's financial statements. ACF alleges that, because of BMA's negligence, CBI's year-end financial statements for 1998 were inaccurate — and, because of the inaccuracy, ACF was misled about the financial condition of CBI. As a result, ACF alleges, it lost hundreds of thousands of dollars on loans made to CBI. ACF brings three claims against BMA: professional malpractice, negligent misrepresentation, and fraudulent misrepresentation.

BMA has moved for summary judgment. BMA is entitled to prevail "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering BMA's motion for summary judgment, this Court must consider ACF's evidence to be true and draw all

reasonable inferences arising from that evidence in ACF's favor.  *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

Turning first to ACF's professional malpractice claim:  ACF has not cited — and the Court has not found — any Minnesota caselaw that explicitly authorizes a non-client to sue an accountant for malpractice.[1]  Rather, under Minnesota law, a non-client in ACF's position appears to be limited to bringing claims of negligent or fraudulent misrepresentation against an accountant in BMA's position.  *Cf. Bonhiver v. Graff*, 248 N.W.2d 291, 298-99 (Minn. 1976) (relying on the draft Restatement (Second) of Torts section regarding negligent misrepresentations to find liability); *NorAm Inv. Servs., Inc. v. Stirtz Bernards Boyden Surdel & Larter*, 611 N.W.2d 372, 374-75 (Minn. Ct. App. 2000) (same).

It is true, as ACF argues, that no Minnesota court has explicitly held that a non-client *cannot* sue an accountant for malpractice.  It is also true, as ACF points out, that *Bonhiver* discussed malpractice and negligent misrepresentation interchangeably (although all of the actionable conduct in *Bonhiver* consisted of negligent misrepresentations).  *Bonhiver*, 248 N.W.2d at 295-96; *see also L&H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 378 (Minn.

---

[1]Both parties cite *Witzman v. Lehrman, Lehrman & Flom*, No. C6-98-555, 1998 WL 713500 (Minn. Ct. App. Oct. 13, 1998), *rev'd*, 601 N.W.2d 179 (Minn. 1999).  The Court of Appeals in *Witzman* appears to assume, without much discussion, that a non-client may in some circumstances maintain an action for professional negligence against an accountant.  *See id.* at *3.  The court nevertheless affirmed dismissal of the professional malpractice claim for lack of a duty of care under the particular facts of that case.  *Id.*  That holding was not at issue in the Minnesota Supreme Court, which ultimately reversed the Court of Appeals decision and affirmed the district court's dismissal of the remainder of the plaintiff's claims.  *Witzman*, 601 N.W.2d at 191.

The Court of Appeals decision in *Witzman* has never been cited in any other case.  More importantly, its analysis of third-party professional malpractice claims against accountants is superficial at best.  Thus, this Court does not find *Witzman* to be persuasive authority that such claims are cognizable under Minnesota law.

1989) (stating that *Bonhiver* recognized the tort of negligent misrepresentation). But this case would be a poor vehicle for recognizing a new tort under Minnesota law. The only allegedly negligent conduct of BMA that harmed ACF was the issuance of inaccurate financial statements. BMA concedes that, if ACF can make out a claim of negligent or fraudulent misrepresentation with respect to those statements, ACF can recover damages. ACF concedes that, if it *cannot* make out a claim of negligent or fraudulent misrepresentation with respect to those statements, it has no basis for recovering for professional malpractice. Because it is doubtful that Minnesota would permit ACF to sue BMA for malpractice, and because, as a practical matter, nothing turns on the question, ACF's professional malpractice claim is dismissed.

Turning next to the misrepresentation claims: Under Minnesota law, an accountant (such as BMA) may be held liable for negligent misrepresentation to a third party (such as ACF) where the third party is one

> for whose benefit and guidance [the accountant] intends to supply the information or knows that the recipient intends to supply it; and [who suffers a loss] through reliance upon it in a transaction that [the accountant] intends the information to influence or knows that the recipient so intends . . . .

Restatement (Second) of Torts § 552 (1977); *Bonhiver*, 248 N.W.2d at 298-99 (adopting draft form of the Restatement (Second) rule). The elements of a fraudulent misrepresentation claim are the same, with the addition of the element of scienter. *See Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986) ("Fraud is distinguished from negligence by the element of scienter required.").

ACF's theory of the case is that BMA's negligence and fraud resulted in an overstatement of CBI's inventory in its 1998 year-end financial statements. This inventory error concealed the fact that CBI was in default on covenants in its loan agreements with ACF. ACF

is an asset-based lender, and thus it was critically important for the company to receive accurate information about the value of CBI's assets, and critically important for CBI to comply with covenants requiring it to maintain sufficient assets to cover the value of the outstanding loans. According to ACF, if the 1998 year-end financial statements had been accurate, ACF would have known that CBI was in default in March 1999, when the statements were issued. Had ACF known that CBI was in default, ACF contends, ACF would have foreclosed on its loans, liquidated CBI's assets, and recovered the full amount due.

Instead, ACF did not learn that CBI was in default until March 2000, when BMA disclosed the accounting error that created the overstatement of inventory. (BMA alleges that it discovered the inventory error in the 1998 statements in the course of preparing CBI's 1999 statements.) Because CBI's financial position had deteriorated rapidly during 1999, liquidating CBI in March 2000 — in contrast to liquidating CBI in March 1999 — would not have made ACF whole. Rather than liquidate CBI, ACF made additional loans to CBI to keep the business afloat.

ACF insists that, in making those additional loans, it was acting reasonably to mitigate its damages. According to ACF, by March 2000, the best chance it had of recovering on its loans was through the sale of CBI's intangible assets to a third party, and keeping CBI afloat was essential to preserve the value of those intangible assets. In further pursuit of this plan, ACF and CBI engaged in a "friendly foreclosure" in 2002, under which CBI essentially sold all of its assets — tangible and intangible — to CB Hockey, LLC, a newly-created company backed by ACF. After this transaction, CBI's debt to ACF was reduced to $268,000.

ACF then made loans to CB Hockey. According to ACF, these loans were additional reasonable attempts to mitigate the damages it suffered as a result of CBI's default. Unfortunately, though, CB Hockey went out of business a year later and surrendered its assets to ACF. After ACF liquidated those assets, it was left with approximately $656,000 in unpaid loans.

For purposes of its summary judgment motion, BMA concedes that it acted negligently in overstating CBI's inventory on the company's 1998 year-end financial statements. BMA also concedes that summary judgment cannot be granted on the question of whether BMA acted with scienter. Instead, BMA argues that it is entitled to summary judgment because ACF is unable to offer any evidence that, had it known the true state of CBI's inventory in March 1999, it would have foreclosed on its loans and liquidated the company. BMA points out that, when ACF discovered the error in March 2000, ACF did not even consider liquidation and made no effort to determine the liquidation value of CBI. Instead, after several months of deliberations and its own independent evaluation of CBI's financial condition, ACF decided to loan more money to CBI after concluding that CBI stood a good chance of resolving its financial problems and emerging as a profitable business.

In BMA's view, these facts prove that ACF did not act in reliance on BMA's erroneous financial statement. Without reliance, there can be no recovery for either negligent or fraudulent misrepresentation. *See Bonhiver*, 248 N.W.2d at 298-99; *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986). Moreover, BMA argues that, when ACF decided to enter into new loan transactions with CBI after being fully appraised of the accounting error, ACF waived any right to seek damages from BMA. At a minimum, BMA argues, ACF's damages must be

limited to $268,000, the amount left outstanding on the CBI loans after the 2002 foreclosure. To the extent ACF suffered damages exceeding $268,000, those damages are attributable to decisions to loan money to CB Hockey — decisions that were made without relying on any representation by BMA.

In response, ACF contends that, by March 2000, it was so obvious that the liquidation value of CBI had fallen below the amount of the outstanding loans that no investigation was necessary. Hiring accountants to determine the exact amount of the shortfall would have been a waste of money; mitigation was the most rational course of action. BMA counters by pointing out that the ACF loans were backed by the personal guarantees of the controlling shareholders of CBI, and that, even if the liquidation value of the company had fallen below the amount of the outstanding loans, ACF would still have been made whole in March 2000 had it liquidated CBI and enforced the personal guarantees. ACF counters this counter by pointing out that most of the personal wealth of the controlling shareholders was connected to the value of CBI itself, and thus ACF reasonably concluded in March 2000 that the shareholders did not have sufficient personal wealth to back the guarantees.

As this summary of the parties' positions suggests, there are numerous disputes regarding material facts that preclude summary judgment. These disputes include whether ACF would have liquidated CBI in March 1999 had it known of the true state of CBI's inventory; whether liquidation in 1999 would have sufficed to pay off CBI's outstanding loan amount at that time; whether liquidation in 2000 would have sufficed to pay off the then-outstanding loan amount; whether, after liquidation in 2000, the guarantors could have paid the remaining loan balance; and whether ACF's efforts to mitigate damages were reasonable.

Likewise, the Court cannot grant partial summary judgment based on BMA's argument that its liability should be limited to $268,000, the amount left outstanding on the loans after the 2002 "friendly foreclosure." The Court confesses that it is skeptical that ACF will be able to recover more than $268,000 at trial. After all, the losses in excess of $268,000 were suffered *after* CBI went out of existence because an entirely *new* company backed by ACF failed to live up to ACF's expectations. But it can be difficult to know where efforts to mitigate losses suffered on an old transaction end and where investments in new and separate transactions begin. This is an issue that is best left for trial.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [Docket No. 95] is GRANTED in part and DENIED in part.

2. Defendant's motion is GRANTED with respect to plaintiff's professional malpractice claim (Count I). That claim is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. Defendant's motion is DENIED in all other respects.

Dated: November 27, 2006         s/Patrick J. Schiltz
                                 Patrick J. Schiltz
                                 United States District Judge